UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WENDA HARBOUR,

Plaintiff,

v.

UNIVERSITY CLUB OF WASHINGTON,

Defendant.

Case No. 21-cv-2047 (CRC)

MEMORANDUM OPINION

Plaintiff Wenda Harbour is the Director of the Events Department at the University Club

of Washington ("the University Club" or "the Club"), a social club and events venue.  In this suit

against her employer, she raises discrimination, failure to accommodate, and wage and hour

claims arising out of the University Club's treatment of her request to work remotely during the

COVID-19 pandemic due to an alleged high-risk respiratory condition.  The Club moves to

dismiss nine of the fourteen claims in the complaint.  Harbour opposes dismissal of some claims

and withdraws others.  She also requests—although not through formal motion—that the Court

accept a proposed amended complaint.  For the reasons below, the Court will allow Harbour to

amend her complaint and will grant the motion to dismiss in part and deny it in part.

I.   **Background**

A.  Factual Background

Ms. Harbour has served as the Director of the Events Department at the University Club

since November 2018.[1]  Am. Compl. ¶¶ 5, 14.  She was and remains the only African American

---

[1] The Court draws the following facts from Harbour's proposed amended complaint,
which she attached as an exhibit to her opposition brief.  See Am. Compl., ECF No. 10-1.
Although the request for leave to amend was not properly presented, the Court will accept the

woman department director at the Club.  Id. ¶ 6.  As the Events Director, Harbour plans, markets, and coordinates staffing for events at the University Club, and also manages the Department's operations.  Id. ¶ 8.  When she began in that role, Harbour had sixteen direct reports—including two employees who worked directly on-site to manage events.  Id. ¶ 10.  Because Harbour could arrange events by email and telephone and her staff largely handled on-site management during events, Harbour regularly worked remotely after her hiring.  Id. ¶¶ 11–15.

At the start of the COVID-19 pandemic, the University Club temporarily suspended all events, but it began reopening in late April 2020.  Id. ¶¶ 19–20.  Harbour has pre-existing health conditions, including Chronic Obstructive Pulmonary Disease, that make her both more susceptible to COVID and higher risk should she contract the virus.  Id. ¶¶ 25, 29.  So when the Club summoned Harbour to return to work in-person in June 2020, she asked to continue to work remotely as a reasonable accommodation for her health risks, consistent with the recommendation of her doctor.  Id. ¶ 27.

Harbour alleges that the University Club's management did not accommodate this request, and instead began to retaliate against her in several ways.  Among other things, she claims that management threatened to demote her to Banquet Manager—a position that would require on-site work and come with a $27,000 pay cut.  Id. ¶ 31.  That December, the Club insisted that Harbour return to work in-person full time, despite her physician's continued recommendation that she stay home whenever possible, and despite Harbour's ability to complete the job from home.  Id. ¶¶ 46–47.  When Harbour refused and continued to work from

---

amendment, as explained in more detail in Part III.A, infra.  While the University Club no doubt contests many of the alleged facts, the Court must accept them as true at the motion to dismiss stage.  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

home, the Club required her to count half the hours she worked from home as "sick leave"—in other words, to record an eight-hour work day as four hours of work and four hours of leave, taken from the bank of sick leave she had accrued since beginning her job.  Id. ¶¶ 52–56. Finally, Harbour alleges that, after she hired counsel to pursue various claims arising out of these incidents, management further retaliated against her by hiring another director above her in the chain of command and moving her former direct reports into another department.  Id. ¶¶ 67, 76–77.

Separately, Harbour alleges that she was exposed to COVID at a University Club event that management required her to work in-person before she was vaccinated against the virus.  Id. ¶ 37.  She contends that the Club was informed of the exposure just a few days after an event attendee tested positive, but did not tell her until more than ten days later.  Id. ¶¶ 37–40.  Harbour fell ill during the interim and continues to suspect that she had COVID, although she tested negative at the time.  Id. ¶¶ 42–44.

B.  Procedural History

In June 2021, Harbour filed suit against the University Club in District of Columbia Superior Court.  See Compl. ¶¶ 1–4.  The complaint includes fourteen claims.  They include claims for race, gender, and disability discrimination and retaliation in violation of the D.C. Human Rights Act; claims for violations of the D.C. Wage Theft Prevention Amendment Act and D.C. Accrued Sick and Safe Leave Act; and several common law claims.  See id. ¶¶ 70–205. The original complaint frames two of the claims—for improper record keeping under D.C.'s sick leave statute and for failure to pay accrued sick leave—as collective, on behalf of Harbour and other similarly situated University Club employees.  See id. ¶¶ 191–205.

The Club removed the case to federal court under this Court's diversity jurisdiction.  See Notice of Removal at 1–2.  It then moved to partially dismiss for both lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Rule 12(b)(6).  See Mem. in Supp. of Mot. Partially Dismiss ("MTD") at 2.  The motion does not touch the race, gender, and disability discrimination and retaliation claims (Claims I–V), but it mounts a variety of attacks on the nine other claims in the complaint (Claims VI–XIV).

Harbour largely opposes the motion to dismiss.  She asks, however, to withdraw one negligence claim (Claim XI) and her proposed collective claims (Claims XIII and XIV).  See Opp'n at 16.  In her opposition, Harbour also seeks leave to amend her complaint.   In particular, she seeks to reinstate one of her collective claims—alleging violation of a record-keeping requirement in the D.C. Accrued Sick and Safe Leave Act—as an individual claim.  See id.  She also seeks to add factual allegations.  She attaches the proposed amended complaint as an exhibit, but has not filed any separate motion for leave to amend.

## II.   Legal Standards

A motion under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction." Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987).  "[T]he plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over its claim by a preponderance of the evidence."  Marine Wholesale & Warehouse Co. v. United States, 315 F. Supp. 3d 498, 508 (D.D.C. 2018) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  In evaluating a 12(b)(1) motion, the Court "must accept as true all uncontroverted material factual allegations contained in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determine jurisdictional questions.'"  Id. (quoting Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C.

Cir. 2011)).  Where necessary, the Court may also consider "undisputed facts evidenced in the record" or its own "resolution of disputed facts" to assure itself that it has jurisdiction.  Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Rule 12(b)(6) requires dismissal of a complaint that fails "to state a claim upon which relief can be granted."  When evaluating a 12(b)(6) motion, the court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).  Although a complaint need not provide "detailed factual allegations" to withstand a 12(b)(6) motion, it must offer "more than labels and conclusions."  Twombly, 550 U.S. at 555.

### III.  Analysis

As outlined below, the Court will grant the University Club's motion to dismiss in part and deny it in part.  Harbour's common law claims must be dismissed because the D.C. Workers' Compensation Act provides her the exclusive remedy for such workplace injuries.  But the Court will not dismiss the remaining challenged claims, which center on various alleged violations of the D.C. Wage Theft Prevention Amendment Act and the D.C. Accrued Sick and Safe Leave Act.  These claims—along with the race, gender, and disability claims untouched by the Club's motion—remain to be tested at summary judgment and/or trial.

A.  <u>Leave to Amend</u>

The Court begins with Harbour's request to amend her complaint, which she presented on the final page of her opposition to the motion to dismiss.  <u>See</u> Opp'n at 16.  Although the amended complaint was not properly presented, the Court will construe her opposition as a motion to amend and grant Harbour leave to do so.

Harbour is not entitled to amend as a matter of course because her proposed amendment was untimely.  Rule 15(a)(1) allows a plaintiff to amend its complaint once as a matter of course within 21 days of service of a 12(b) motion.  <u>See</u> Fed. R. Civ. P. 15(a)(1)(B).  Although Harbour moved to extend her time to respond to the Club's motion, she did not similarly request extension of her amendment deadline.  <u>See</u> Pl.'s Mot. for Extension of Time, Sept. 15, 2021, ECF No. 9.  Her later-filed amendment request thus does not fall within the parameters of Rule 15(a)(1).  <u>See</u> <u>Hayes v. District of Columbia</u>, 275 F.R.D. 343, 345 (D.D.C. 2011).

The Court can, however, still grant Harbour leave to amend under Rule 15(a)(2).  To be sure, to amend under Rule 15(a)(2), a plaintiff should file a motion to amend the complaint and a proposed amended pleading.  <u>See</u> <u>Rollins v. Wackenhut Servs., Inc.</u>, 703 F.3d 122, 130 (D.C. Cir. 2012).  "[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)."  <u>Id.</u> (alteration in original).  Still, Rule 15 instructs courts to give leave to amend "freely . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Indeed, it is an abuse of discretion to deny leave to amend without a sufficient reason such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'"  <u>Uzoukwu v. Metro. Wash. Council of Gov'ts</u>, 983

F. Supp. 2d 67, 83 (D.D.C. 2013) (alteration in original) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

Applying those principles here, the Court will forgive Harbour's procedural failures and accept the amended complaint.  Courts in this district have been particularly unwilling to grant an amendment request when a party seeks leave to amend only generally, without providing the court with a proposed pleading for review.  See, e.g., Edwards v. Wilkinson, 233 F. Supp. 2d 34, 38–39 (D.D.C. 2002) (rejecting request "to blindly deny a valid motion so that the plaintiff can amend his complaint with any document labeled as an amended complaint").  Although Harbour did not separately articulate the grounds for her amendment request, she did provide a proposed amended pleading, which allows the Court to better understand what she seeks to change and what grounds could support the amendment.  Examining that amended pleading, the Court finds the types of changes Harbour seeks to make are proper.  The amended complaint first withdraws claims or certain aspects of them in response to the motion to dismiss.  See Opp'n at 16.  Those are precisely the kind of changes the Court might require after a ruling on the motion to dismiss. See Ghawanmeh v. Islamic Saudi Acad., 268 F.R.D. 108, 110 (D.D.C. 2010).  To the extent Harbour has added new factual allegations, they do not change the theories of liability supporting any claim.  Instead, these new allegations largely add detail and update the Court on events that have transpired since the filing of the complaint.  See, e.g., Am. Compl. ¶¶ 75–79.  Again, those amendments are appropriate.  For that reason, the Court will use the amended complaint as the basis for the remainder of this opinion.[2]

---

[2] Accordingly, the Court need not address the two claims Harbour has entirely withdrawn:  one for negligence (Claim XI of the original complaint) and one putative collective claim for failure to pay accrued sick leave (Claim XIV of the original complaint).  The Court will otherwise use the numbering of claims in the amended complaint in this opinion.

B. <u>Common Law Negligence Claims (Claims X, XI)</u>

After amendment, two common law claims remain. The first, for negligent infliction of emotional distress, arises out of a November 2020 incident where, Harbour alleges, management failed to notify her promptly of COVID exposure at a University Club event. Am. Compl. ¶¶ 178–86. The second, for negligent supervision, focuses on the Club's alleged failure "to ensure" that Harbour's managers "did not break District of Columbia laws and/or engage in tortious conduct." <u>Id.</u> ¶ 189. The Club seeks dismissal of these claims on the ground that they are preempted by the D.C. Workers' Compensation Act ("WCA").[3] The Club is correct.

The WCA provides compensation for "[t]he injury or death an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia." D.C. Code § 32-1503(a)(1). The WCA is an "employee's exclusive remedy against the employer . . . for any illness, injury, or death arising out of and in the course of his employment." <u>Id.</u> § 32-1504(b). In D.C., "[a]n injury arises out of and in the course of employment when it occurs in the course of the employment and as the result of a risk involved in or incidental to the employment or to the conditions under which it is required to be performed." <u>Wright v. D.C. Dep't of Emp. Servs.</u>, 924 A.2d 284, 287 (D.C. 2007) (internal quotation marks omitted). Under this "positional-risk test, an injury arises out of employment so long as it would not have happened but for the fact that conditions and

---

[3] The University Club frames its WCA argument as a jurisdictional challenge to Harbour's negligence claims. <u>See</u> MTD at 6. But whether a common law claim is precluded by the WCA is not a jurisdictional question in federal court. <u>Lockhart v. Coastal Int'l Sec., Inc.</u>, 905 F. Supp. 2d 105, 115 n.9 (D.D.C. 2012). The "appropriate basis for dismissal," then, is failure to state a claim under Rule 12(b)(6). <u>Id.</u>

obligations of employment placed claimant in the position where she was injured." Georgetown Univ. v. D.C. Dep't of Emp. Servs., 830 A.2d 865, 872 (D.C. 2003).

Courts applying D.C. law have held that the WCA can bar the two types of common law claims at issue here: negligent supervision and negligent infliction of emotional distress. See Lockhart v. Coastal Int'l Sec., Inc., 905 F. Supp. 2d 105, 117 (D.D.C. 2012) (gathering cases). And based on the facts alleged, both claims clearly seek to impose liability for injuries that "would not have happened but for" Harbour's employment at the Club. Georgetown Univ., 830 A.2d at 872. Her negligent infliction of emotional distress claim stems from an event she says she was forced to attend because of her job. And her negligent supervision claim seeks recovery for an alleged failure to monitor and correct the supervisory decisions of two managers with respect to her schedule and compensation.

The Court is not persuaded by Harbour's contention that the WCA does not apply because she seeks recovery for workplace *harms* rather than workplace *injuries*. See Opp'n at 8. The cases she cites do not support that proposition. King v. Kidd, for instance, dealt with a different labor statute with a different exclusivity regime, and it involved allegations of sexual harassment—which are not covered by the WCA regardless. See 640 A.2d 656, 662–63 (D.C. 1993); Est. of Underwood v. Nat'l Credit Union Admin., 665 A.2d 621, 634 (D.C. 1995). Crowley v. North American Telecommunications Ass'n is likewise unhelpful. See 691 A.2d 1169 (D.C. 1997). The defamation claim there arose out of a statement an employer made about a *former* employee—long after the course of his employment ended. See id. at 1171–72. More broadly, WCA case law makes no distinction between physical injury and emotional harm. Rather, as the D.C. Court of Appeals has explained, a "claim[] of emotional distress based upon acts of a supervisor or co-worker" may be an "injury . . . compensable under the Act if it arises

9

out of and in the course of employment." Wright, 924 A.2d at 287 (internal quotation marks omitted).

The Court will therefore dismiss Claims X and XI of the Amended Complaint as preempted by the WCA.

C.  Wage Theft (Claim VI)

The Court next turns to Harbour's claim that the University Club violated the D.C. Wage Theft Prevention Amendment Act ("the Wage Theft Prevention Act"), D.C. Code § 32-1301 et seq., when it forced her to relinquish accrued sick and vacation time for a portion of the work hours she completed remotely.  The University Club contends that this claim fails as a matter of law because Harbour "admits" in her complaint "that she was receiving her salary for a workweek."  MTD at 10.  In the Club's view, because Harbour's paycheck was never docked, her claim arises at most under the D.C. Code provisions governing sick leave, which the Court will discuss below.  The Court rejects this argument because Harbour has sufficiently alleged that accrued sick leave constitutes "wages" under the relevant statute.

The D.C. Wage Theft Prevention Act requires employers to "pay all wages earned to his or her employees."  D.C. Code § 32-1302.  The Act defines "wages" as "all monetary compensation after lawful deductions, owed by an employer," including, as relevant here, any "[o]ther remuneration promised or owed" pursuant to a contract or law.  Id. § 32-1301(3). "[D]iscretionary payments" thus do not qualify as wages under the Act because they "are not owed, but are given only by leave of the employer."  Dorsey v. Jacobson Holman, PLLC, 756 F. Supp. 2d 30, 36 (D.D.C. 2010).  By contrast, where entitlement is "automatic and mandatory upon satisfaction" of pre-set conditions, compensation constitutes wages.  Molock v. Whole Foods Market, Inc., 297 F. Supp. 3d 114, 134 (D.D.C. 2018); see also Pleitez v. Carney, 594 F.

Supp. 2d 47, 48–49 (D.D.C. 2009) (construing definition of wages to cover earned and accrued vacation hours).

Under that definition, the sick leave Harbour says she is owed, at least as pled in the amended complaint, qualifies as "wages." Harbour alleges that, per the University Club's governing handbook, "sick leave is earned and accrued paid time off, and is a benefit that employees are entitled to, based on time worked." Am. Compl. ¶ 53. To the extent the Club forced Harbour to use her sick time for hours she in fact worked, it effectively deprived her of that compensation later on—should she need to take time off when actually sick, or if she would otherwise receive the accrued payments when leaving her position. While the remedy Harbour seeks does not and cannot include any back wages, that is not the only relief the statute authorizes. See D.C. Code § 32-1308(a)(1)(A)(iv) (authorizing "[s]uch legal or equitable relief as may be appropriate"). Ordering reformation of Harbour's pay sheets to accurately reflect accrued compensation is within the Court's power, and doing so would restore to her the wages to which she is purportedly entitled under the Act and her contract. The Court therefore will not dismiss Claim VI.

D.  Failure to Pay Accrued Sick Leave (Claim VIII)

In Claim VIII, Harbour alleges that the University Club "functionally" failed to pay her the sick leave she was entitled to under the D.C. Accrued Sick and Safe Leave Act ("the Sick and Safe Leave Act") by "forcing" her "to relinquish accrued sick leave for purposes other than being off work for actually being sick." Am. Compl. ¶ 161. The University Club seeks dismissal of this claim because, in its view, Harbour is only alleging "a fear of future injury," with "no present harm to adjudicate." MTD at 2. The Club contends that "there is nothing to suggest that [Harbour] does not or will not have sick leave available for potential future use," or

that she had been "denied use of sick leave for future purposes." Id. at 14.  This argument appears to go to whether Harbour has been injured by the Club's actions, and therefore her standing to bring a claim under the Sick and Safe Leave Act.  The Court therefore construes this argument as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  See Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015).  The Court will deny that motion because Harbour has pled present, non-speculative injury.

"The 'irreducible constitutional minimum of standing contains three elements': injury in fact, causation, and redressability." Id. (quoting Lujan, 504 U.S. at 560–61).  "Injury in fact is the 'invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" Id. (quoting Lujan, 504 U.S. at 560).   In the operative complaint, Harbour alleges that she had accrued sick leave according to the statute and the University Club's handbook as of December 2020, but that she was forced to exhaust that banked time for purposes other than those authorized under the Sick and Safe Leave Act. See Am. Compl. ¶¶ 52–56.  Taking away an earned benefit—a fixed amount of accrued time off—is an actual and concrete injury, even if its full effects won't be felt until Harbour needs to use those hours or asks to be paid out when she leaves her position.  The University Club can't override these allegations by claiming that Harbour might not be "denied use of sick leave for future purposes." MTD at 14.  While Harbour might have no injury if the Club had restored her allegedly unlawfully depleted hours, it has not done so—nor said it would do so going forward.  Neither allowing Harbour to begin accruing hours anew, nor vaguely promising to gift her more hours in the future, remedies the ongoing harm Harbour has alleged she suffers.  The Court will therefore deny the motion to dismiss Claim VIII.

E.   Retaliation (Claims VII, IX)

Two of Harbour's claims allege retaliation based on protected activity:  In Claim VII, she alleges that University Club management retaliated against her for challenging acts that purportedly violated the D.C. Wage Theft Prevention Act.  See D.C. Code § 32-1311 (prohibiting retaliation for exercising rights under Wage Theft Prevention Act).  And in Claim IX, she alleges that management retaliated against her for challenging its failure to properly calculate sick leave in accordance with the D.C. Accrued Sick and Safe Leave Act.  See D.C. Code § 32-531.08(a) (prohibiting individuals from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of, or the attempt to exercise, any right provided by this subchapter").  The University Club disputes that Harbour has stated any viable retaliation claim because, in its view, she has not alleged the requisite adverse employment action.  The Court is not persuaded.

Courts in this district "apply the McDonnell Douglas burden-shifting framework to statutory retaliation claims under District of Columbia law."  Bartolo v. Whole Foods Mkt. Grp., Inc., 412 F. Supp. 3d 35, 44 (D.D.C. 2019) (gathering cases).  To establish a prima facie case of retaliation under this test, "a plaintiff must show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists."  Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999). The parties have not identified any case law defining "adverse personnel action" for retaliation claims under either the Wage Theft Prevention Act or the Sick and Safe Leave Act.  Without any guidance to the contrary, then, the Court will apply the prevailing standard in other kinds of retaliation claims under both federal and D.C. law:  in such circumstances, a plaintiff only needs to show "employer action that would have been materially adverse to a reasonable employee." Bereston v. UHS of Del., Inc., 180 A.3d 95, 112 (D.C. 2018) (alteration omitted) (quoting

Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006)); Smith v. D.C. Off. of Hum. Rts., 77 A.3d 980, 993 (D.C. 2013) (applying standard to D.C. Human Rights Act retaliation claim). An action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge" of a violation of the relevant statute. Burlington, 548 U.S. at 68. "Typically, though not inevitably, such an action is one that has 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'" Bereston, 180 A.3d at 112 (quoting Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002)).

Harbour suggests that several sets of allegations in her complaint constitute a sufficiently materially adverse act to support a claim for retaliation. The Court will deny the motion to dismiss because it finds at least one set of allegations suffices: those related to a purported *de facto* demotion. The D.C. Circuit has held that "reassignment with significantly different responsibilities" as well as an "extraordinary reduction in responsibilities" could constitute materially adverse employment actions for retaliation claims.[4] See Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006). It has likewise cautioned that "[w]hether a particular reassignment of duties constitutes an adverse action . . . is generally a jury question," so long as "a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities." Czekalski v. Peters, 475 F.3d 360, 365 (D.C. Cir. 2007).

_____

[4] In a recent *en banc* decision, the D.C. Circuit held that, for the purposes of a Title VII discrimination claim, a transfer decision can qualify as an adverse event even without any showing of "objectively tangible harm." Chambers v. District of Columbia, 35 F.4th 870, 872 (D.C. Cir. 2022). In so doing, the court expressly distinguished discrimination and retaliation claims—in effect preserving case law indicating that a purely lateral transfer could not be a materially adverse event for the purposes of the latter. Id. at 876–77; see Pardo-Kronemann v. Donovan, 601 F.3d 599, 607 (D.C. Cir. 2010). This decision does not affect the Court's analysis here, as the gravamen of Harbour's complaint is that she was effectively demoted—not that she was transferred to a position similar in kind.

Harbour has sufficiently pled that she was functionally reassigned to a position with different, lesser responsibilities.  In her amended complaint, she alleges that, after she raised concerns about the University Club's sick leave and work-from-home pay policies, the Club placed a new supervisor above her in the chain of command, unlike her other director-level counterparts; moved her former reports to another department; and hired two people to take over the bulk of her work.  See Am. Compl. ¶¶ 67, 76–78.  Seeking to diminish these allegations, the University Club maintains that it at most "add[ed] additional members" to Harbour's team—the kind of management decision courts will not typically second guess.  See MTD at 13.  But at the motion to dismiss stage, the Court must treat Harbour's factual allegations as true.  Sparrow, 216 F.3d at 1113.  And those allegations indicate that the Club did far more than add members to her team:  By requiring her to report to a new supervisor and reducing her responsibilities and workload, it effectively demoted Harbour, in substance even if not in form.[5]  That is sufficient to satisfy the standard for a materially adverse employment event, so the Court will deny the motion to dismiss.

To provide additional guidance to the parties in discovery and at summary judgment, the Court will also weigh in on the two other potential adverse actions Harbour raises.  First, she points to management's decision "forcing [her] to liquidate" her sick leave.  Opp'n at 12.  But plaintiffs bringing retaliation claims must allege "distinct retaliatory act[s]," beyond the trigger for their protected activity.  See Harris v. Chao, 257 F. Supp. 3d 67, 89 n.28 (D.D.C. 2017).  And here, Harbour alleges that she was retaliated against for complaining about the University Club's

---

[5] At summary judgment, the Club will also have an opportunity to raise any legitimate, nonretaliatory reason for any functional reassignment, Holcomb, 433 F.3d at 901—including the need to cover Harbour's workload while she took medical leave in the second half of 2021.

sick-leave policy.  See Am. Compl. ¶¶ 153, 168.  That same policy cannot also serve as the nucleus of the retaliation claim, as doing so would improperly "double-count[]" the University Club's actions.  Harris, 257 F. Supp. 3d at 89 n.28.

Second, Harbour alleges that she suffered a materially adverse event when a University Club administrator "threatened" to force her to relinquish additional sick leave and vacation time.  Am. Compl. ¶¶ 154–55.  The Court finds this one to be a close call.  The D.C. Circuit has indicated that "[a] threatening verbal statement, standing alone, might well constitute a materially adverse action."  Gaujacq v. EDF, Inc., 601 F.3d 565, 578 (D.C. Cir. 2010).  But "in assessing such a claim, . . . '[c]ontext matters,' and "'the significance of any given act of retaliation will often depend upon the particular circumstances.'"  Id. (quoting Burlington, 548 U.S. at 69).  To the extent the context here is clear, the alleged threat arose as part of a larger dispute about how to calculate sick leave and how it should be taken.  And, crucially, it doesn't appear this threat was ever carried out.  In at least one analogous context, the D.C. Circuit has indicated that proposed discipline that is never implemented does not qualify as a materially adverse action.  See Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (applying rule to proposed suspension).  Because there is some uncertainty about the details and context of the statement, the Court will allow this basis for the claim to survive the motion to dismiss.  The Court may revisit this determination on a fuller record at summary judgment.

   F.   Improper Record Keeping (Claim XII)

That leaves the final claim the University Club seeks to dismiss—for violations of the record-keeping provisions in the Sick and Safe Leave Act.  That provision requires employers to "retain records documenting hours worked . . . and paid leave taken by employees" going back a certain number of years.  D.C. Code § 32-531.10b(a).  When there is any issue about an

employee's entitlement to leave, an employer's failure to "maintain or retain adequate records" will give rise to a "rebuttable presumption that the employer has violated" the Act.  Id. § 32-531.10b(b).

Harbour's claim here centers on a conversation with the University Club's Human Resources Manager Paula Clarke on March 18, 2021.  Am. Compl. ¶¶ 16, 62.  Clarke told Harbour that her sick leave balance was "incorrect" because the Club's system required Clarke to "manually" enter vacation and sick time allocations and thus was "subject to error."  Id. ¶¶ 62–63, 196.  Harbour contends that this kind of "'manual' and inaccurate record keeping" violates the Sick and Safe Leave Act.[6]  Id. ¶¶ 197–201.

The University Club seeks to dismiss this claim on the ground that there is no cause of action to enforce the record-keeping provisions of the Sick and Safe Leave Act.  See MTD at 14–17.  In response, Harbour suggests that the Club's "failure to keep accurate records . . . interfered with [her] ability to take and use her sick leave," as prohibited by the Act.  See Opp'n at 14.  But she does not explain how this interference occurred, clarify why the statute would authorize her to file suit based on any such interference, or point to any cases where courts have considered freestanding record-keeping claims.  The Court finds this to be a difficult question—one made harder by the lack of developed legal argument by the parties, as well as the apparent absence of case law found in the Court's own review.  Still, for the reasons below, the Court will deny the motion to dismiss on this ground at this early stage of the case.

---

[6] In her original complaint, Harbour pled her record-keeping claim on a collective basis on behalf of other University Club employees.  See Compl. ¶¶ 191–97.  She now reasserts it as an individual claim.  See Am. Compl. ¶¶ 194–201.  Because the Court has already granted Harbour leave to amend, it will allow her to pursue the claim individually.

The Court begins with the relevant provisions that could authorize private enforcement of the record-keeping requirement.  The Sick and Safe Leave Act contains its own private right of action—authorizing "[a]n employee or similarly situated employees injured by a violation of this subchapter . . . to maintain a civil action."  D.C. Code § 32-531.12(a).  But the parties turn instead to the private right of action in the Wage Theft Prevention Act.  See MTD at 14–15; Am. Compl. at 27–28.  That statute provides that "a person aggrieved by a violation of . . . the Sick and Safe Leave Act . . . may bring a civil action in a court of competent jurisdiction against the employer . . . and, upon prevailing, shall be awarded" a variety of relief, including back wages, statutory penalties, and other legal or equitable relief.  D.C. Code § 32-1308(a)(1)(A).  The Court will follow the lead of the parties and assume that the Wage Theft Prevention Act's private right of action is the relevant one for Harbour's claim.

The Court tentatively concludes that this broadly worded provision authorizes suits, like Harbour's, based on violations of the Sick and Safe Leave Act's record-keeping provision alone. The statute does not define "aggrieved."  See D.C. Code § 32-1301.  And, as far as the Court can tell, no court has yet addressed whether an employee can be "aggrieved," for purposes of § 32-1308, by violations of a statutory record-keeping requirement alone.  Cf. Molock, 297 F. Supp. 3d at 135 n.8 (assuming without deciding similar question with respect to Minimum Wage Revision Act's record-keeping provision because "any recovery" would be "duplicative" of damages awarded for other claims).  But in other contexts, the D.C. Court of Appeals has interpreted the word "aggrieved" "according to [its] ordinary sense[,] . . . to mean 'suffering from an infringement or denial of legal rights.'"  In re C.T., 724 A.2d 590, 595 (D.C. 1999) (internal citation and quotation marks omitted) (quoting Webster's Third New International Dictionary 41 (1976)) (defining aggrieved for purposes of appellate jurisdiction statute).

At least two courts—both from other jurisdictions—have applied a similar definition, and have reasoned that a violation of an employment statute's record-keeping requirement can render an employee aggrieved under similarly broad statutory provisions.  See Garcia v. Right at Home, Inc., No. SUCV20150808BLS2, 2016 WL 3144372, at *5 (Mass. Super. Jan. 19, 2016) (concluding plaintiffs could be "'aggrieved' by virtue of not receiving accurate pay slips" because "[a]n aggrieved person is broadly defined . . . to include anyone who has suffered some infringement of legal rights"); LQD Bus. Fin., LLC v. Fundkite, LLC, No. 19-C-4416, 2020 WL 635906, at *7–8 (N.D. Ill. Feb. 11, 2020) (interpreting Illinois statute's authorization of suit by "[a]ny employee aggrieved" to "authorize[] private actions without limitation," including for violations of a record-keeping requirement).  But see Williams v. Merle Pharmacy, Inc., No. 15-cv-1262, 2015 WL 6143897, at *4 (C.D. Ill. Oct. 19, 2015) (reaching opposite conclusion on Illinois statute on ground that an employee who had not received proper payroll information was "only harmed in an incidental fashion" by a reduced "ability to prove the amount of compensation" due).  The Court therefore at least tentatively concludes that the broad wording in § 32-1308 authorizes Harbour to bring a claim based on a failure to comply with a statutory record-keeping provision.

The Court is not, at this juncture, convinced by the arguments the Club offers to the contrary.  It first points to § 32-1308's remedies section and suggests that a plaintiff must "have some sort of wage withheld" to be aggrieved under the statute.  See MTD at 15–16.  The Court recognizes that the statute's damages provisions focus on withheld wages.  See D.C. Code § 32-1308(a)(1)(A) (authorizing "payment of any back wages" and "[l]iquidated damages equal to treble the amount of unpaid wages").  But the Act also authorizes other remedies, including "[s]tatutory penalties" and the ordering of additional "legal or equitable relief."  Id.  At a

minimum, Harbour could seek injunctive relief, such as reformation of her pay sheets to account for the balance of sick leave she believes she is owed.  See Am. Compl. ¶ 201 (requesting "all remedies available to her under the law").  The remedial scheme thus does not rule out the possibility that Harbour is "aggrieved."

The University Club next proposes that the statute's structure precludes finding that the private right of action covers Harbour's claim.  It contends that, because the record-keeping requirement is not situated in the sections requiring provision of paid leave or outlining prohibited acts, its only function is to "help identify *whether* a person is aggrieved by" a violation of the Act.  MTD at 16.  But the two provisions the Club points to—D.C. Code §§ 32-531.02 and 32-531.08—are not the only sections of the statute that contain enforceable commands.  For example, § 32-531.09 requires employers to post certain notices in a conspicuous place in the workplace, and it imposes a civil penalty on employers who do not comply.  The record-keeping requirement's placement in a standalone provision, then, does not preclude finding a private right of action to enforce it.

This is not to say there are no counterarguments.  For instance, the presence of a civil penalty in the Sick and Safe Leave Act's posting requirement in some ways cuts the other way.  While the D.C. Council provided a clear financial penalty for violation of this seemingly procedural requirement, it did not do so for the record-keeping provision.  There, the only consequence identified in the statute is a "rebuttable presumption" against a noncomplying provider in any enforcement proceeding.  See D.C. Code § 32-531.10b(b).  Moreover, it is not clear exactly how Harbour has alleged she was, in fact, aggrieved by a violation of the record-keeping provision.  The Court could conceive of such an injury—such as, for example, declining to take sick leave based on uncertainty about the amount earned.  But Harbour only asserts

generally that the Club's record-keeping practices "interfered with" her ability to accrue and use sick leave.  <u>See</u> Am. Compl. ¶ 199.  That kind of conclusory allegation may not be enough to support a viable claim, even if a private right of action does exist.

But given the open legal and interpretive questions surrounding the relevant statutory provisions, the Court will nevertheless allow Harbour's record-keeping claim to survive the motion to dismiss.  The Court may revisit this determination as necessary at later stages of the case.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Partially Dismiss in part and deny it in part.  A separate Order shall accompany this memorandum opinion.


                                                  _____
                                                  CHRISTOPHER R. COOPER
                                                  United States District Judge

Date:  <u>June 27, 2022</u>